[No. 1759.]

STERLING JOHNSON *v.* THE STATE.

1. PRACTICE — EVIDENCE — PROOF OF REPUTATION.— If a criminal intention is of the essence of the offense charged, the accused may, as relevant to the question of his guilt or innocence, put in issue and prove his general character in that respect which is impugned by the accusation. But the evidence should be restricted to the trait of character which is in issue; that is, it ought to have some analogy and reference to the nature of the charge. The extent of the issue presented by the defendant was that his reputation was good as a "peaceable negro, and one who was always polite to white people, especially ladies," and it was error to permit the State to go further and prove his reputation as a "law-abiding man."

2. SAME — CHARGE OF THE COURT.— When the main charge of the court embraces all of the law upon a question at issue in a trial, the court is not required to give special instructions upon the same subject. See the opinion *in extenso* for charges upon the questions of specific intent and identity *held* sufficient.

3. SAME — ASSAULT WITH INTENT TO RAPE.— The defendant requested the court to charge as follows: "If the jury believe from the evidence that the witness Mattie Belle Walker was, at the time of the alleged assault, from sickness, nervousness or other cause, in such mental condition that her faculties were impaired, and she believed the defendant was making an assault upon her, when in point of fact defendant nor any one else was present, and said witness was laboring under an hallucination as to the presence of the defendant, they will find the defendant not guilty." *Held*, obnoxious as being upon the weight of evidence, and therefore properly refused.

4. SAME — FACT CASE.— See the statement of the case for evidence *held* insufficient to support a conviction for assault with intent to rape.

APPEAL from the District Court of Tarrant. Tried below before the Hon. A. J. Hood.

The conviction in this case was for an assault with intent to rape Mattie Belle Walker, in Tarrant county, Texas, on the 1st day of

August, 1883. A term of two years in the penitentiary was the punishment assessed by the verdict.

Miss Mattie Belle Walker was the first witness for the State. She testified that she was fourteen years old in May, 1884. During August, 1883, the witness lived where she now lives, about nine miles north from Fort Worth, and about one mile from Fossil Creek. On or about the first day of that month, while the witness was at home alone, her mother having gone to visit a neighbor, and her brother Willie being on his way to work in the field, she heard some one halloo at the gate. Going to the door, she saw the defendant at the front gate on horseback. He dismounted, came to the porch, and asked for a drink of water. Witness went into the house, got a glass, set it down on a table near the front door of the hall, and told the defendant that he could take it and get a drink from the well in the yard. He took the glass, went to the well, got a drink, returned with and set the glass down on the table, and asked the witness if any of the folks were at home. Witness told him that no one but herself was at home. Defendant then asked if he was on the right road to Fort Worth. Witness replied that he was, and he remounted his horse and rode off. As he rode off, the witness ran to her brother Willie, who was at the lot near the house, preparing to go to the field, and told him that a negro had been to the house asking for water, and that she was very much frightened. Her brother told her to go back to the house, and to call him if the negro came back and troubled her. Witness returned to the house, lay down on a bed in the hall, and was soon fast asleep.

The witness did not know how long she had slept, when she heard a footstep on the porch. Thinking it was the step of her brother Willie, the witness lay still. Presently some one laid a hand on her head and said "halt!" Witness opened her eyes instantly and saw that it was the defendant returned. She sprang from the bed, thoroughly frightened, and ran screaming towards the field in which her brother was at work. As the witness escaped from the bed, the defendant cried "halt!" again, and caught her dress, from which, where the skirt joined the waist, he tore a piece of cloth. Defendant threw a rock which barely missed the witness's head, just as she went out at the back door. Witness looked back just before she got to the fence, and saw that the defendant was still pursuing her. Witness did not know how, but she managed in some way to get over the fence, and ran screaming towards her brother. Witness positively recognized the defendant as the man

who assaulted her in Tarrant county, on the day mentio ied, in the manner described. She saw and recognized him next dr y in Squire Furman's office, in Fort Worth.

On cross-examination the witness testified that when this assault upon her was perpetrated, she was convalescing from a ong spell of sickness. She had been confined to her bed for five o ' six weeks, and had been out of bed and about the house not excee ing a week. The sickness referred to was occasioned by swallowing a pin. On the former trial of this case the witness testified that her sickness was spinal meningitis. She was told by the children that such was her malady. She swallowed the pin in May, and after her recovery was taken sick again. This last sickness was in July, and it was that attack which was pronounced meningitis. The witness was very sick during her last attack, and was out of her head a great deal of the time. She was very weak and nervous at the time of the assault, and easily frightened. She was very much afraid of the defendant from the first, so very much afraid of him that she would not hand him the glass to get his water. During her sickness the witness frequently woke from sleep out of her mind. Witness was thin and weak at the time of the assault, but had grown since, and was now fleshier. Witness did not know how long she slept before she was awakened by the defendant. The house in which the assault was made stood on high ground — as high as any in the neighborhood. The assault was committed about 4 o'clock in the evening. Defendant did not put his hand on any part of the witness's person except her head, and he said nothing but "halt."

Willie Walker, the brother of the prosecutrix, was the next witness for the State. He testified that he was nineteen years old. Some time after dinner, between 2 and 3 o'clock, he thought, on the day of the alleged assault, the witness's sister, Mattie Belle Walker, came running from the house to the witness at the stable lot, and told him that a negro had been to the house and that she was very much frightened, and her appearance and behavior showed that she was in very great alarm. Witness told her to go back to the house and stay and to call to him if anything happened. Witness then went to his work in the field. Mattie was alone in the house, her step-mother having gone to some of the neighboring houses on a visit. Some time afterwards, the witness could not say how long, the witness, who was then a quarter of a mile away at work in the field, heard his sister Mattie scream, and looking up saw her running towards him. She was then near the back fence, some fifty yards distant from the house. He immediately quit his

work and started towards the house. As Mattie ran towards him, the witness could see her hands and head, but on account of the fence and intervening undergrowth of weeds, could not see the lower part of her body, nor could he see the lower part of the house.

Witness ran and met Mattie, and, as she got to him, she fell at his feet. Her dress was torn at the waist. She then told the witness that the negro man had returned, put his hand on her head and told her to "hold on," and had grabbed and torn her dress, and thrown a rock at her as she ran. She was greatly frightened. Witness took her up and walked her slowly back to the house, which he immediately entered and secured his gun. Witness went to the front porch and looked, but could see no one. Witness then told Mattie to go to her uncle Jim's house, while he went to his uncle George's. Witness then mounted his pony and rode over to his uncle George Walker's and told him what had happened. It was agreed that Mr. George Walker should follow the road, while the witness should attempt to get ahead of the negro. Accordingly witness made a rapid circuit, and came into the Fort Worth road about three miles from the house of his step-mother. Witness rode back on the road a short distance, when he met the defendant and Mr. George Walker, riding along the road together towards Fort Worth. As soon as witness joined them Mr. George Walker placed his pistol against the defendant and ordered him to throw up his hands. Defendant did so. A pistol was found in the defendant's coat, which lay before him across his saddle. Defendant asked what was the matter, and Mr. George Walker replied that he supposed he, defendant, had got into trouble at that white house back there. Defendant asked what white house, and, when told, he admitted that he went to the house, got some water and asked about the road, but denied that he went back the second time. Witness and his uncle George took the negro on to town, and he was examined next day before 'Squire Furman.

Cross-examined, the witness stated that after defendant's arrest on the road he asked to be taken back to the house for the purpose of seeing if Mattie could recognize him, which request was refused. Witness could not say how long a time elapsed between the arrest and this request to be taken back. The request was made, however, on the road before town was reached. The words of his request were: "Take me back to the little girl, and I will prove by her, if any one did anything to her, it was not me." The house in which this assault is alleged to have been committed stands on high ground, in a thickly settled prairie neighborhood. An orchard

of about an acre on the southwest side of the house contains the only semblance of timber in the neighborhood. Quite a large area of the surrounding country is visible from the porch of the house. The road on which the defendant was arrested was a lately opened road to Fort Worth. It passed out of sight of the house at a distance of half a mile, after skirting around the orchard. Mattie was convalescing from a recent illness at the time of the assault. She had been ill with spinal meningitis, or so, at least, her attending physician, Doctor Harmon, once told the witness. Doctor Farmer visited Mattie once. She was very ill during this attack, and was not expected to recover. She was out of her mind a great deal of the time during her illness, and had spasms that would bend her body backwards and forwards. She had been out of her bed a week, perhaps more, at the time of the alleged assault. She was out of her mind oftenest when she waked from sleep. She was weak and nervous and easily frightened. Doctor Farmer lived in the neighborhood. He had not been summoned as a witness. Mattie was in her right mind, and her mind was in no way affected at the time of the assault.

George Walker was the next witness for the State. He testified that he lived in Tarrant county, and was the uncle of Mattie Belle and Willie Walker. On the day of the alleged assault, Willie Walker came to witness's house and gave the alarm, and immediately the witness got his horse and pistol and took the road south, which is the road that runs in front of the house in which Mattie and Willie live, sending Willie to circle ahead and meet witness. *En route* George Banners told witness that a negro man had stopped at his house, got a drink of water and asked about the road. That road was a recently opened and little traveled road, almost impassable at the creek. Witness rode on as far as the creek, when he saw the defendant on the opposite side of the creek, lying down, his horse loose and grazing near. As soon as the defendant heard the witness approaching, he sprang to his feet and looked straight at the witness. Witness rode on as though he had no intention of stopping. When witness got opposite to him he saw the butt of a pistol protruding from his coat, which lay in a bundle, and on which the defendant had evidently been resting his head. He hailed witness and asked which way witness was going. Witness replied that he was going a short distance down the road. He then said that he was going to Fort Worth and would ride with the witness. He caught his pony, tied his coat on the front of his saddle and started on with witness. He said that he had been hunting a horse, which

he described to witness and claimed to have lost, and said that he was going into Fort Worth. Witness asked him his name, and he said it was Sterling Johnson, and that he had lived in Denton and Dallas counties. Witness called over the names of several persons in Denton county and defendant claimed to know some of them and not to know others. He also told witness that he was "on a general bum," or something of the kind.

When witness and defendant were presently joined by Willie Walker, witness threw his pistol down on defendant and ordered him to hold up both hands. Defendant did so, seemingly very much frightened and surprised. He was then disarmed and taken to Fort Worth. He asked witness, as soon as he got his hands up, what he was arrested for. Witness replied: "I guess you got yourself in trouble back there at that white house." When witness explained the nature of the charge against him, he admitted that he went to the house and asked the little girl for a drink of water, but denied that he went back the second time. Witness brought him to Fort Worth and lodged him in jail.

Cross-examined, the witness denied that at any time after the arrest the defendant asked him, witness, to take him back to confront the little girl. From the house in which the assault was made to where witness found the defendant lying down, the distance was about two miles. Ten minutes had elapsed after getting the news before witness overtook defendant at the creek.

Doctor Harmon was the next witness for the State. He testified that he had attended Mattie Belle Walker as her physician. He treated her for pneumonia in January, 1883, and some time afterwards for swallowing a pin. He had never treated her for spinal meningitis, and she had never had that disease to the knowledge of the witness.

Cross-examined, the witness stated that Mattie became very sick when she swallowed the pin, and had spasms until she passed the pin and got well. Witness had never known the mind of any one to be affected by spinal meningitis after they had recovered sufficiently to be up. Had heard of, but never known, such cases. Witness never told Willie Walker or anybody else that Mattie had the spinal meningitis. The State closed.

Amanda Johnson, the wife of the defendant, was the first witness introduced in his behalf. She testified that she had been married to the defendant for eighteen years. The defendant was forty-eight years old at the time of this trial. He was a slave until emancipated at the close of the war, and belonged to Mr. ——, of Denton

county.  Since his emancipation and marriage he has lived principally in Denton county, but resided a short time in Dallas.  He owns some land and two houses, which he has purchased since his freedom.  He lives in the one he owns near the town of Denton. The witness knew that the defendant's business in Tarrant county, when arrested, was to look for a horse which he had lost.  At Pilot Point he learned that the horse had been seen in the neighborhood of Fort Worth, and hence his presence in that vicinity.  He left home riding his own horse, informing the witness that he was going towards Fort Worth.  Witness heard of his arrest about three days after he left, and, coming to Fort Worth, found him in jail, where he has been ever since.

George Banners testified, for the defense, that he resided in Tarrant county.  Witness's wife was the niece of George Walker.  His house stood near the public road, about one and a half miles distant from the house in which Mattie Belle Walker lived.  Witness was at home on the day of the alleged assault.  The defendant rode up to the witness's house on that afternoon, and asked for a drink of water.  Witness told him to go to the well in the field and help himself.  He dismounted, went to the well and got a drink of water, returned leisurely to the house, and asked the witness for directions to Fort Worth.  The witness directed him to take the new road, on which he was afterwards arrested.  He took the road mentioned and rode off in the direction witness advised.  He rode off, as he came to the house, leisurely and in no apparent haste.  Witness at no time observed anything unusual about the appearance of either the defendant or his horse.  A short time after the defendant left the witness's house, George Walker rode up and told him about the assault on Mattie Belle.  Witness told George Walker about the defendant stopping for water, and pointed out the direction the defendant had taken.  George Walker left in pursuit.

George Marshall was the next witness for the defense.  He testified that he lived in the town of Denton, Denton county, Texas. He had known the defendant for quite a number of years.  The witness knew that, a day or two before his arrest, the defendant left Denton on horseback to look for a horse that he had lost.  Witness saw him start on what he told witness was a horse-hunting trip. The defendant had long been a married man, and was the owner of two houses and some land near the town of Denton.  Both he and his wife are industrious, hard-working people.  Among other things, they take in washing for a livelihood.  Witness was familiar with the defendant's reputation in the neighborhood of his residence, as a

peaceable man, and a man universally polite and inoffensive toward women, and particularly towards white women. It was perfectly good in that respect. Defendant is not a preacher, but is a member and elder or steward of the church of which the witness is pastor, and he sometimes exhorts at class meetings.

Enoch Ammons testified that he lived in Denton and had long known the defendant. Defendant was a married man, the owner of property near Denton. He enjoys the reputation of being a peaceable man, polite and inoffensive towards ladies. The defense closed.

In rebuttal, the State introduced Dallas Clark, sheriff of Denton county. He testified that he knew the defendant, who lived near the town of Denton. Witness had never heard his reputation as a peaceable man, and a man polite to white women, discussed. In reply to the State's question, and over defendant's objection, witness stated that the defendant's reputation as a law-abiding man was bad.

Cross-examined, witness stated that he had never heard the defendant's character or reputation discussed in connection with offenses of the nature of the one charged against him. While a slave the defendant belonged to a Mr. Boone, who lived in Denton county. Defendant owned some real estate near Denton.

The motion for new trial raised the questions discussed in the opinion.

*Ball & McCart* filed an able brief and argument for appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. Appellant was convicted for an assault with intent to commit a rape.

On the trial defendant introduced testimony to the effect that his general reputation was that "of a peaceable negro, and one who was always polite to white people, and especially to ladies,"— the prosecutrix being a white lady. Afterwards the State placed a witness upon the stand and asked him the question: "What was the reputation of defendant in Denton county for being a peaceable, law-abiding man?" That portion of the question which called for defendant's reputation as a "law-abiding man" was objected to by defendant, for the reason that evidence of his reputation should be confined to those qualities which had reference to the kind and class of offenses as the one on trial, and that evidence of reputation as to violations of the law in other respects than with regard to cognate crimes was calculated to mislead and prejudice the jury. The

objection was overruled, and evidence of his general reputation " as a law-abiding man " was allowed.

It is a well established rule that " when a criminal intention is of the essence of the offense charged, the accused may, as relevant to the question of his guilt or innocence, put in issue and prove his general character in that respect which is impugned by the accusation." (*Coffee* v. *The State*, 1 Texas Ct. App., 548; *Lockhart* v. *The State*, 3 Texas Ct. App., 567.) But the evidence should be restricted to the trait of character which is in issue, that is, it ought to have some analogy and reference to the nature of the charge. (3 Greenl. Evid., § 25; *Leader* v. *The State*, 4 Texas Ct. App., 162; *Jones* v. *The State*, 10 Texas Ct. App., 552; Whart.'s Crim. Evid. (8th ed.), § 60 and note.) It was error to permit the prosecution to investigate defendant's general reputation as "a law-abiding man" when he had not put it as such in issue.

It is insisted that the charge of the court omitted to instruct the jury " that the intent should be proven beyond a reasonable doubt, as well as the assault itself, and that the court erred in refusing defendant's first special instruction, which supplied the omission." This objection is not borne out by the record. On the contrary, the jury were expressly told in the charge that, in order to " warrant a conviction, among other things it is incumbent on the part of the State to satisfy your minds beyond a reasonable doubt, first, that the assault charged was committed, as charged, with the actual intent to commit the offense of rape on the said Mattie Belle Walker. Second, that it was the defendant, Sterling Johnson, and not another, who committed the assault." This charge fully meets the points asked in defendant's instructions relative to the specific intent and the fact of defendant's identity with the party making the assault, and, the court having already properly charged the law upon these phases of the evidence, was not required to give additional special instructions upon the same subject.

Another special instruction requested by defendant and refused was in these words, viz.: "If the jury believe from the evidence that the witness Mattie Belle Walker was, at the time of the alleged assault, from sickness, nervousness or other cause, in such mental condition that her faculties were impaired, and she believed the defendant was making an assault upon her, when in point of fact defendant nor any one else was present, and said witness was laboring under an hallucination as to the presence of defendant, they will find the defendant not guilty." It is believed that this instruction is obnoxious to the objection that it was upon the weight of

evidence, and therefore was properly refused. We will not comment upon the evidence (which will be fully reported), but in our opinion it is not sufficient to support this conviction.

Because the court erred in admitting illegal evidence, and because the evidence is not sufficient to establish the crime alleged and the conviction, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered February 14, 1885.]